Thank you, Your Honor. I'm Dean von Kallenbach here on behalf of the appellant Auburn Ace. I'd like to reserve, if I may, three minutes for rebuttal. Keep track of your own time. Yes, Your Honor. The bankruptcy court here determined that Auburn Ace's former president, Ben-Horaz, had authority to enter into the Centrum loan and also that Auburn Ace's claim was barred by the Washington Data Trust Act. The District Court on Appeal affirmed on the application, we believe... On apparent authority. On apparent and actual authority, Your Honor, for the District Court. And we believe both of those decisions were wrong because there are significant questions of fact here that precluded the decisions. Regarding actual authority, what the District Court held, and this is at ER 4, was that the resolution, the November 2006 resolution, quote, gave actual authority to Horaz. And the resolution we're talking about states in very clear terms that Auburn Ace can enter into a loan up to $20 million upon terms and conditions approved by Ben-Horaz, its president. So on its face, it seems very clear that the resolution does grant actual authority to Mr. Horaz. And if this resolution were a contract, there would be no question. Centrum spends a fair amount of time in its brief talking about contract law saying that Auburn Ace at this point can't disavow the language of the resolution, the parole evidence rule applies, et cetera, et cetera. But the resolution is not a contract. It's a resolution by a company delegating authority to one of its officers, and it's used as an objective manifestation of third parties regarding that authority. That's governed by the law of agency, not by the law of contract. It's not a contract between Ben-Horaz and Auburn Ace. It's a resolution, and agency law applies. And with agency law, when you talk about actual authority, actual authority is the authority the principal intends to give to the agent, and the agent understands he has. Is it enough to sustain the judgment of the district court if he had apparent authority? It would be, and we'll get to that point in a minute, Your Honor. Okay. In this case... That seems to me the point at which you're more vulnerable. All right. Well, in this case, in terms of actual authority, it's the parties themselves who determine who has actual authority, and the facts are undisputed that Auburn Ace never intended to give actual authority to Mr. Horaz. Mr. Horaz understood he didn't have actual authority. The district court even noted that in its opinion, that Mr. Horaz said, I didn't have actual authority. So we think the district court erred on that ground. Now, we get to apparent authority. First of all, whether apparent authority exists is generally a... requires a factual determination that precludes summary judgment, and I think it's important here to put this case, this particular question or issue in context of the entire case. Auburn Ace's claim against Centrum is part of a larger lawsuit. It's a RICO lawsuit against a number of different defendants, and we contend in the lawsuit that one of the reasons, the primary reason Centrum paid off or paid this loan, issued this loan, was to pay off fraudulent deeds of trust and promissory notes that had been issued by bingo against the property some months before. The record is clear that Centrum was reluctant to make this loan to Auburn Ace. It didn't believe Auburn Ace's property was worth $5.5 million. It required Mr. Horaz to put his property, his home up for additional security, and Centrum was adamant that it would not issue a loan unless it got title insurance to cover the amount of the loan. So with that background, we get into apparent authority. You know, the resolution, yes, clearly could be an objective manifestation of Mr. Horaz's authority. A third party could rely upon that. A third party reading that could reasonably believe that Mr. Horaz had authority. But the facts here are that Centrum did neither. Centrum neither believed he had authority or relied upon the resolution. Washington follows the restatement second of agency and the restatement of agency. And there's a long line of cases that talk about reliance. Apparent authority is a form of estoppel. And a principle is estopped to deny the apparent authority of an agent where the appearance of authority in the agent and a third party has relied upon the apparent authority as if it were actually conferred. Now, that's what we think the law is in Washington. And there's, again, a long line of cases. Judge Lasnik disagrees with that on that reliance point. Judge Lasnik does. Judge Lasnik, going with the Ranger decision, said that in his opinion, apparent authority exists if the principle makes an objective manifestation that causes a third party to actually and reasonably believe the agent has authority. That's what Ranger says. I'll look at DLS v. Maven, which says the doctrine of apparent authority is intended to protect third parties who justifiably rely upon the belief that another is the agent of the principle. So, we have essentially two different lines of cases here. One that talks about actual and reasonable belief. The other one that talks about justifiable reliance. The two concepts are different, but I'm not sure and I don't believe in this particular case that it matters because the evidence is that Centrum neither justifiably relied nor reasonably believed that Mr. Arez had authority. Now, the district court said that Centrum required this resolution to satisfy itself and its title insurance company that Mr. Arez had the authority to enter into the loan. We disagree with the district court and suggest the district court is incorrect. Centrum generally does not require a borrower to provide any sort of borrowing resolution. In fact, the only reason they said, the only reason we usually get one is to figure out what name to put on the loan. A business card works just as good for us. Centrum's policy is that it does not investigate or verify whether the person signing the loan has been authorized to do so by a company. You know, you could help me a little bit by just explaining a factual matter. I do know that Centrum testifies that they didn't particularly care themselves, but they did care because of title insurance. And could you describe to me what the terms of the title insurance were? That is to say, what was Centrum getting from the title insurance company? Well, according to the title insurance company, the declaration by the title insurance company, they were providing a policy that insured against a variety of events. One of them would be, apparently, would be that Mr. Arez did not have authority to enter into the loan. It would be a lack of authority claim. I have not read the title insurance policy. Is that in the record? I believe it is in the record, Your Honor. I can find it then, yeah. But let's get to that point then regarding the title insurance policy here. What the district court said was, undisputedly, the title company was acting on Centrum's direction and on its behalf when it obtained and reviewed the policy of title insurance. And the evidence in the record doesn't support that at all. This was an arm's-length transaction between Centrum and the title insurance company. Centrum did not direct First American Title to go out and determine whether Mr. Arez had the actual authority to enter into the loan. The direction Centrum gave to the title insurance company was that it could not close this loan unless and until it was willing to ensure that Centrum's deed of trust was valid. It's a very, very substantial difference here. Centrum admits, we don't care whether he has authority. In fact, it doesn't matter to us whether he has authority or not. All we care about is that we get a policy of title insurance. And the evidence is also clear. So maybe I do need to look at that. So what exactly is the title insurance insuring against? Well, I presume it would insure against things such as... No, I'm not asking you to presume. If you don't know, tell me what you don't know. I don't know exactly, Your Honor. But here, the title insurance company did not owe any sort of a duty to Centrum to do any sort of investigation on Centrum's behalf. The title insurance company is going to be on the hook for a $5.5 million policy of insurance. It has a duty to itself to investigate, to make sure it wants to issue this policy of title insurance. And so we have a situation here where, as Centrum says, we didn't know whether Mr. Arez had authority. We didn't care whether Mr. Arez had authority. We're not relying upon his authority. We're not relying upon the resolution. We're not relying upon anything related to Mr. Arez and his authority. We are relying solely upon the policy of title insurance. And the title... And we don't even know what the title insurance investigates at Centrum. We have no idea what they look at. They don't talk to us about it. They get it directly from the borrower. They make their own decision. If they issue the policy, we'll make the loan. If they don't issue the policy, we won't make the loan. Now, what the court... But while you're sitting and waiting for your rebuttal, if you could find in the record where the title insurance policy is, and then just when you stand up and rebuttal, I would appreciate it. You can direct me to it. I guess the question here, and it's a critical question, is, you know, was First American acting on Centrum's behalf when it reviewed the resolution, which everybody admits was the only indicia of Mr. Arez's authority? At the very least, there's a question of fact regarding that. Whether First American, we call it reliance by proxy at one point, can Centrum rely upon the acts of a third party to determine whether or not Mr. Arez had authority? And again, Centrum says, we didn't know. We didn't care. We weren't relying on the title company for that. We were relying on the title company to determine whether or not they'd issue a policy. The other issue for the district court was ratification. And what the district court held was that even if Mr. Arez didn't have authority, that Albernese ratified the Centrum loan. Now, again, whether ratification occurs is generally a question of fact. That precludes summary judgment. And again, in this situation, we really have two people here. We have Ben Arez, and we have Patrick, and there's three people, Pat and Jan Cavanaugh. Since Mr. Arez, the district court said, assuming he didn't have authority, I guess we're looking at whether Mr. Cavanaugh ratified the loan. And the evidence here is very much in dispute. Mr. Cavanaugh says, I didn't even know about this loan for four or five months afterwards. When I found out that our property had suddenly been encumbered by a $5.5 million loan, my first concern was, did I sign something inadvertently that made me personally liable? His next concern, after resolving that one, was, can I keep this property, which has been in my family for 120 years, out of foreclosure? It wasn't until March of 2008, when he was in an arbitration with Mr. Arez, that he discovered what had happened to the $4.7 million that had gone to pay off these bingo deeds of trust. And were those bingo deeds of trust, they were secured by the property as well? They were secured by the property as well, and the district- So if they had not been paid off, the property would have been foreclosed on under those loans. Well, and therein lies the issue here, because what the district court said was that Auburn Ace clearly accepted the benefits of the Centrum loan because the vast majority of the loan proceeds were used to pay off the existing bingo loans. Thereby preventing foreclosure on those loans. Except, the district court made its decision in March of 2009. In June of 2009, in the bankruptcy case, we obtained a summary judgment against bingo. In which the bankruptcy court held that, or this is June 2010, the bankruptcy court found that the bingo notes and deeds of trust were for loans that had never been made. That those notes and deeds of trust were null, void, and unenforceable. And that, but for the existence of those notes and deeds of trust, the $4.7 million would have gone to Auburn Ace, not to bingo. So we have a situation here where the district court thought the bulk of the money was going to pay off a valid obligation. As it turns out, and as we argued at the time, these were not valid obligations. These were fraudulent notes and deeds of trust on our property that the money went to pay. And then again, this is part of the overall lawsuit we have here for our recall claim against a variety of defendants. So- There's only two minutes left. Yes, Your Honor. If you want to save time for rebuttal. I will do that very quickly, Your Honor. Again, we get back to the question here about whether or not we affirmed or ratified the loan, and that's very much a question of fact. The real issue here is, what could Auburn Ace have done? After the $4.7 million goes to pay off the bingo loans, is there any money? It can't possibly pay off the $5.5 million for the loan. And Washington Supreme Court has held that the retention of benefits does not amount to a ratification if the party cannot be placed in status quo and cannot repudiate the entire transaction without loss. There was no way here, once the money had been paid to bingo, that Auburn Ace could possibly have paid the money back. There's no way we could have been returned to the status quo. And so we contend that there's very much a question of fact regarding the issue of Thank you. Thank you. May it please the Court, my name is Kennard Goodman. I'm here on behalf of Wells Fargo Bank and Centrum Financial. I'll just be referring to Centrum because Wells Fargo is pretty much passive. Let me start with the title insurance. The policy begins at ER 341 of the record. And part of what title insurance provides, and it's coverage number five. It says that it insures against the invalidity or unenforceability of the lien of the insured mortgage upon the title. And that would include an unauthorized deed of trust, somebody signing a deed of trust that doesn't have authority to do so.  On behalf of itself, because it doesn't want to write a bad policy. It's also providing a service to the insured by looking up things that the insured may want to know about. And thereby protecting them against going into an unauthorized transaction. And the testimony, in the reply brief, we were told that Centrum did not rely on the written review and that there was no evidence that First American reviewed the written consent on Centrum's behalf. And in fact, the First American title officer who closed the loan submitted a declaration, this is at ER 338, and he states, accordingly, on Centrum's behalf, I reviewed the written consent of directors to determine if Banner Rez was authorized to encumber the Auburn A's property. So what you have then is in preparing the title policy, the title insurance company is acting on its own behalf. It's acting on behalf of the insured in this commercial transaction. And one of the things they ascertain is, does the person signing this, the documents in this transaction, have authority to do so? What this case is boiled down to at this point is that Centrum is trying to get out of repaying the, I'm sorry, Auburn A's is trying to get out of repaying the Centrum loan, but it wants to keep all the loan proceeds for itself. And I'll come back to that in a sec as we work through this. But first, I understand that a lot of the concern is the apparent authority. But on actual authority, we just heard counsel admitted that on its face, the written consent confers actual authority on Mr. Rez. He says it's not a contract, though. On the other hand, when Auburn A sues Mr. Rez to say you've acted without authority, he's going to say, here's the written consent. It's a contract. It's a written agreement between the parties. I mean, it may be prepared unilaterally by the board of directors, but it's presented to Mr. Rez and says, this is your authority. So we say, principles of contract law do apply. And in that case, all these prior conversations that went on before the resolution was prepared are irrelevant. You have this complete agreement. The other point to keep in mind is that Mr. Kavanaugh signed that written consent in November 2006. He says, well, it was given to me and told I had to sign it really quickly, because Mr. Rez was rushing off to Utah to talk with another lender. I didn't read it. Apparently, he didn't read it while Mr. Rez was flying to Utah to see this other lender. He didn't read it in the following month before the centrum loan was done. So if I'm Mr. Rez and I'm saying, well, I've got this resolution that says I've got unfettered power and Mr. Kavanaugh signed it, he's had it for a month. He hasn't told me that he disagrees with it. I think Mr. Kavanaugh's silence constitutes, again, a ratification. It's a manifestation to Mr. Rez that, yes, in fact, you do have this full power. So I think we do actually have actual authority here on apparent authority. Again, Count Auburnace has conceded that the written consent in and of itself creates a apparent authority. And their whole point is, well, there's no reliance. And we've already talked about that, that centrum itself did not review the written consent. It relied on the title company to review it for them. And I think there's nothing in the law that says that reliance can't be done through a third party, a title company, an attorney, an employee. There was reliance. In this case, the reviewing party was the title company. Do you agree with Judge Lesnik that Washington law does not require reliance? That's a slightly odd proposition, actually. It's difficult. I think I've struggled with that. And I'm not quite sure how you can not have reliance. I mean, it- Not how you can not have it, but how you can not require it. How do you not require it? I'm asking whether the Washington law requires reliance as part of its apparent authority doctrine. Well, I'm not sure if it's reliance on the specific document or just some reliance that the person does have authority. As I read Judge Lesnik's order, he says that the Washington law of apparent authority does not require that someone in your position actually relies on the apparent authority. The only thing that is required, according to Judge Lesnik, is that objective evidence supports the fact that you could, and your determination that he does have it. That's how I read Judge Lesnik. Yeah, well, I would like that, but I'm not certain. Washington law seems to go both. The cases do say reliance. There are some that say not, but- And you're arguing that there is reliance, as it were, in his term, by proxy. Right, right, by proxy. And the simple fact is this loan would not have happened without the written consent. It was never going to close unless there was a document presented on behalf of Auburn Ace showing that Mr. Arrest had the authority to do what he did. There are other issues, too, or other aspects of apparent authority here. Auburn Ace's attorney wrote an opinion letter stating that Mr. Arrest had authority. Now, the attorney was authorized by Auburn Ace to do that. He had actual authority to prepare this opinion letter for Auburn Ace. Within the scope of that actual authority, he represented to Centrum that Mr. Arrest had the authority to do what he was doing. So, again, we have another aspect of apparent authority. There's no question, again, that this went to Centrum and there was reliance. I'm not sure this is relevant to the actual disposition of the appeal, but help me understand what is at stake as a practical matter. If you lose, what happens to your client? If we lose, the loan would be rescinded. They don't have any money to return it. They meaning who now? Centrum. We might have rights to go against Mr. Arrest. I'm not sure if those are time-barred at this point. We would lose our security interest in the property. So you would be reduced to a lawsuit against Mr. Arrest? I think that would probably be our only recourse. Okay. And what about the title insurance? I'm sorry, the title insurance? Title insurance. Yeah, there would probably be, there might be a claim against the title insurer. Well, there better be, given all this fuss about the title insurer. I generally work for title insurers. I'm always cautious on that. Yeah, there would be a claim against the title insurer as well. One more point on apparent authority, which is that in its reply brief, Auburn Ace has resurrected an argument that it made below. It didn't have it in its opening brief, which was that Ares' position as president of a land development company is not enough to create apparent authority. And they cite a number of cases. And just very quickly, I'll just tell you, in all but one of those cases, the transaction at issue was outside the company's ordinary course of business. The only one that is not outside, it's the crown paving case from 1922. And in that case, actually before the contract was awarded, the other party was told that the president did not have authority to do this. Have you foreclosed against Mr. Ares' property? I don't know. We have, yes. It's probably not in the record. But as I understand the loan, it was secured by both the Auburn Ace property and Mr. Ares' property. Yes. And I assume he's also personally liable on the loan? Did he sign in his personal capacity? I'm not sure. I think not. I'm, well, I don't know. Well, his house had better be worth a lot of money then. In this market? Well, the reason I'm asking this is it's quite apparent that the underlying Auburn Ace property didn't even come close to satisfying the amount of the loan. And unless he had a really expensive house, if the only thing you've got is security against these two properties, you've got a very undersecured loan. I believe his house was worth, at the time, I think it was appraised around $500,000 or $800,000. I think this property was... And your loan was for what? $5.5. And the Auburn Ace property sold for what? One and a half? We foreclosed. I don't think it's been sold. Has it been sold yet? No, we don't know. It hasn't been sold yet. They're just holding it. Hoping the market will rise? Aren't we all? Okay. Thank you. Quickly, on ratification, you know, there's three prongs. Strauby versus Beck says there's three ways you can find ratification. If the principal intentionally assumes the obligation imposed without him making an inquiry, or if it accepts the benefit of the acts, or if it acts with full knowledge of the facts. And little is required to constitute ratification. What we have here is Kavanaugh testified that Erez first told him about the central loan in December 2006. And that central... And that, I'm sorry, that Kavanaugh did not ask for copies of the loan documents at the time because that's what Erez did. He took care of financing. That was Kavanaugh's, you know, area of responsibility. Kavanaugh testified that he knew a larger financing had taken place because it started showing up when they were applying to other lenders as early as January of 2007, the very next month. Kavanaugh admits that he knew of the central loan by April or May of 2007 and obtained the loan documents that time, maybe June at the latest. So what we have is as of at the absolute latest, even accepting Mr. Kavanaugh's, you know, portions of his testimony, not as going back to December 2006, is that by June 2007, he knew that Centrum had made a loan. He knew it was for $5.5 million. He knew that Erez had signed the papers. And he knew that he had not reviewed the loan terms before the loan was made or signed anything on the loan. But what does he do? He doesn't get on the phone and call Centrum and say, hey, this loan's not authorized. I'm looking into my remedies. I don't know what they are, but you better be careful because that's not an authorized loan. Instead, he starts looking for investors and sellers. He tells Centrum, look, we're working on this. Here's, we're working on different options. We're going to repay this loan. He does that in June, you know, and through the rest of 2007, he has an investor in November call up Centrum, say please delay the foreclosure because we're working on something and the loan will be paid off. He turns down an offer to buy the property for $6 million because it won't give him enough money after the Centrum loan is paid off. He knew Centrum was paying the real estate, yes, he knew that Centrum was paying the real estate taxes. All this goes on for six, eight, nine months. If you go back to December 2006, 15 months from when the Centrum loan was made before he finally files his complaint in April of 2008 saying, oh, you know what, since this project seems to be going down the tubes, I'm going to, I repudiate the loan. Centrum's not going to pay this. The key here of what's going on is, and this gets into the election of remedies. Kavanaugh could have, in spring of 2007, he could have said, this loan is not authorized, I repudiate it, Centrum, goodbye, good luck, you can try and enforce it if you want. Or, Auburnace could have, through Kavanaugh, said, okay, there's this loan, let's work this out, we'll repay it, I'm going to go and, you know, recover the money however I can. You can't do both, and that's exactly what Auburnace is doing. They've presented this summary judgment from the bankruptcy court that was entered in September, this last September, 2010, against Bingo and Bingo 1. And they have a long quote about, you know, the Bingo loans were invalid, null, void, blah, blah, blah. But then in the brief, they leave out the next two sentences from immediately following that quote. Bingo and Bingo 1 were unjustly enriched by the receipt of a $4.7 million payment from Centrum. Applying the doctrine of restitution, the court orders Bingo to repay $800,000 to Auburnace, and Bingo 1 to repay $3.9 million to Auburnace. So what's Auburnace doing? They're saying, we get $4.7 million from the Centrum loan proceeds, but court, we should not have to repay the Centrum loan. That's a double recovery. They have a judgment against arrest for a portion of that money as well. That's a triple recovery. So they've elected their remedies. They can't both say, we get to get the loan proceeds from Centrum, and we don't have to repay Centrum. I have other points. They're in the brief, though. Thank you very much. Thank you. First of all, the resolution is clearly not a contract. It's a statement of authority by a company that's to be used by third parties. Contract law does not apply in the interpretation of the resolution. Agency law does, and under agency law, both Auburnace and Arres have both said he didn't have authority to enter into the Centrum loan. He has no actual authority, which gets us to apparent authority. The resolution by itself does not give apparent authority. It's an objective manifestation of apparent authority, but you've got to do more than just have a piece of paper. Somebody either has to rely upon that piece of paper to believe he has authority, or they've got to believe from reading the piece of paper that he has authority, depending whether you use Judge Lasnik's approach or what we think is Washington law. And if you didn't believe what's on the piece of paper, maybe you got a letter from counsel. And the letter from counsel, Your Honor, came two weeks after Centrum paid $4.7 million to Bingo. Centrum testified, and it's in the record, we never, we never released money until we get a letter from counsel, well, except in this case. This goes back again to our whole RICO claim theory, that there's a lot more going on here than just Centrum making a loan to an unknown third party. There are a lot of reasons why Centrum made this loan, but as far as the letter from the attorney goes, there's also a question of fact whether he was even our attorney. This is Stafford Fry's, the law firm, and they testified. They said, we represented Erez for a year. We thought he was the client. There's a question whether he was our attorney or Mr. Erez's attorney. We get here again back to, and you mentioned a couple points, one about who does Centrum go after? Well, obviously, they go after the title insurance company. That's why we have title insurance, and that's why they insisted upon title insurance. We did go after Bingo. We got a judgment from Bingo. Bingo is insolvent, no surprise. We had a judgment against Mr. Erez. Mr. Erez is insolvent and in bankruptcy, no surprise. But we have Centrum, and they took our property, and we want our property back, or we, you know, whatever. The problem here about issuing the loan is they're not supposed to issue a loan to somebody who doesn't have authority to get it. If I walk in and say, I'm the president of Microsoft, give me a $5 million loan, and they don't bother to check my authority, well, they don't get their money back. They can try and sue me for it, but it's their mistake to issue a loan without verifying authority. What they're relying upon here is that the title insurance company supposedly verified Mr. Erez's authority, yet they admit, we have no idea what the title insurance company did. And in terms of what they directed the title insurance company to do, if you look at Mr. Numbuena's declaration, and he was the gentleman from the title insurance company, what he says, and this is ER 336 to 338, he says two things. He says, one, Centrum advised First American that it was instructed to close the Centrum loan and disperse the loan proceeds only if First American was willing to ensure that the Centrum deed of trust was a valid lien on the property, among other conditions. And then he concludes by saying, Centrum specifically directed that its loan not close unless and until First American was willing to ensure that its deed of trust was valid. Nowhere in here does Mr. Numbuena say, Centrum told us not to close the loan unless we verify that Mr. Erez had authority to enter the loan, because as Centrum admits, we didn't care. We were going to issue this loan so long as we had title insurance policy. Unless the court has any additional questions. Thank you, counsel. Thanks, Your Honor. Case is targeted to be submitted. The court will take a brief recess.
judges: Reinhardt, Fletcher W. , Rawlinson